IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUN OPTICS, INC., a Utah Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FGX INTERNATIONAL, INC., a Delaware Corporation, | ) | Civil Action No.  1:07cv137 SLR |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION ON DEFENDANT'S NEW ACCUSED PRODUCTS

**CONNOLLY BOVE LODGE & HUTZ, LLP**

R. ERIC HUTZ (#2702)
The Nemours Building
1007 N. Orange Street
P. O. Box 2702
Wilmington, DE 19899
Phone:  (302) 658-9141
Fax: (302) 658-5614
*Attorneys for Plaintiff*
    *SUN OPTICS, INC.*

**OF COUNSEL**
LARRY R. LAYCOCK
CHAD E. NYDEGGER
**WORKMAN | NYDEGGER**
1000 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah 84111
Phone: (801) 533-9800

**DATE:** October 26, 2007

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.   SUMMARY OF ARGUMENT .................................................................................... 2

III.  STATEMENT OF FACTS .......................................................................................... 3

    A.    Nature of the National Chain Drugstore and Mass Merchant Market Segments for the Reading Glass Industry ................................................................ 4

    B.    Sun Optics's Patents Are the Foundation of Its Marketing Strategy to Offer Unique and Proprietary Products in Order to Overcome the Barriers to Entering the Mass Merchant and National Chain Drugstore Market Segments ................................................................................................................ 6

    C.    Sun Optics's Marketing Strategy Based on Its Patents Has Been Successful ............................................................................................................... 7

    D.    FGX Is Infringing the '739 Patent to Thwart Sun Optics's Attempts to Expand Its Distribution of Its Patented Products ................................................... 8

IV.   INTRODUCTION .................................................................................................... 10

V.    STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION ........................... 11

VI.   ARGUMENT .......................................................................................................... 11

    A.    Sun Optics Is Likely to Prevail on the Merits of Infringement and Validity ........ 11

        1.    Sun Optics is likely to succeed on its claim of infringement of the '739 patent by FGX's CVS displays ......................................................... 12

            a)    Legal standards for infringement of utility patents ....................... 12

            b)    The "eyeglass display" language .................................................. 13

            c)    The "display member" limitation .................................................. 13

            d)    The "support member" limitation .................................................. 14

            e)    The "eyeglass case" limitation ..................................................... 16

        2.    The claims of the '739 patent are valid and enforceable ........................... 17

B.     Sun Optics is Suffering Irreparable Harm Because of FGX's Continuing Infringement of the '739 Patent ........................................................................ 19

      1.     Destruction of Sun Optics's Marketing Strategy ...................................... 19

      2.     FGX's Infringement Raises the Barriers to Entry that Exclude Sun Optics from the Market ......................................................................... 22

      3.     A Permanent Injunction After Trial Will Not Be Adequate Relief Because the Clear Case Concept May Be Ruined .................................... 23

C.     The Balance of Hardships Favors an Injunction ................................................... 24

D.     The Public Interest Favors Sun Optics and Entry of an Injunction ...................... 25

VII.     **CONCLUSION** ............................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Labs. v. Andrx Pharms, Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006) ........................................................................25

*Atlas Powder Co. v. Ireco Chem.*,
    773 F.2d 1230 (Fed. Cir. 1985) ........................................................................11

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 1
    32 F.3d 701 (Fed. Cir. 1997) ............................................................................24

*Canon Computer Sys. Inc. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998) ........................................................................17

*Hybritech, Inc. v. Abbott Lab.*,
    849 F.2d 1446 (Fed. Cir. 1988). .......................................................................11

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*
    906 F.2d 679 (Fed. Cir. 1990) ..........................................................................25

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.*,
    205 F.3d 1377 (Fed. Cir. 2000) ........................................................................11

*Netword, LLC v. Central Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001) ........................................................................12

*New England Braiding Co. v. A.W. Chesterton Co.*,
    970 F.2d 878 n.4 (Fed. Cir. 1992) ....................................................................11

*North American Vaccine, Inc. v. American Cyanamid Co.*,
    7 F.3d 1571 (Fed. Cir. 1993) ............................................................................17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ......................................................12

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) ..........................................................................23

*Reebok Int'l v. J. Baker, Inc.*,
    32 F.3d 1552 (Fed. Cir. 1994) ..........................................................................24

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998) ........................................................................................12

## **STATUTES**

35 U.S.C. § 282 ........................................................................................................................17

*35 U.S.C. § 283*..........................................................................................................................11

Fed.R.Civ.P. 65 .........................................................................................................................11

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This case regards patent infringement of U.S. Patent Nos. D525,427, D527,180 and 7,188,739 (the "'427 patent," "'180 patent" and "'739 patent" respectively). The '427 and '180 patents are design patents on cases for reading glasses. The '739 patent is a utility patent claiming eyeglass displays. Only the '739 patent is relevant to the present motion for preliminary injunction, a copy of which is attached hereto as Exhibit A for the convenience of the Court. Plaintiff Sun Optics, Inc. ("Sun Optics") previously moved for a preliminary injunction based on infringement of the '180, '427 and '739 patents by Defendant FGX International, Inc.'s ("FGX") countertop displays and eyeglass cases marketed under the Private Eyes brand, a picture of which is attached hereto as Exhibit B. The Court heard oral arguments on these motions for preliminary injunction on May 18, 2007.[1]

After the May 18, 2007, hearing on Sun Optics's motions for preliminary injunctions, FGX introduced at CVS drugstores a new product ("CVS display") that is accused of infringing the claims of the '739 patent, photographs of which are attached hereto as Exhibit C. On July 5, 2007, Sun Optics filed a Motion for Leave to File Evidence Arising After Oral Arguments in Support of Plaintiff's Motions for Preliminary Injunction ("Motion to Supplement") (D.I. 48), which requested the Court to consider the new accused CVS displays in ruling on the motions for preliminary injunction pending at that time. FGX opposed the Motion to Supplement (D.I. 49) on July 19, 2007, and Sun Optics filed its reply (D.I. 52) on July 26, 2007.[2]  As of the date of this Motion, the Court has not issued a ruling on Sun Optics's Motion to Supplement.

---

[1] The Court also heard oral arguments on FGX's pending Motion to Dismiss at the May 18, 2007, hearing, and denied that motion. August 2, 2007 Order (D.I. 56) at p. 7.

[2] On August 1, 2007, FGX moved to strike certain portion of Sun Optics's reply brief in support of the Motion to Supplement (D.I. 54). Sun Optics opposed FGX's motion to strike (D.I. 59) on August 10, 2007. The Court has not ruled on FGX's motion to strike.

On August 7, 2007, one week after briefing on the Motion to Supplement was complete, the Court issued an Order denying Sun Optics's motions for preliminary injunction based on the Private Eyes countertop displays and cases. This Order, however, does not rule on Sun Optics's Motion to Supplement. The Court's Order also does not indicate that the CVS displays were considered in rendering its decision on the motions for preliminary injunction pending at that time. Consequently, Sun Optics has filed the present motion for preliminary injunction based on the accused CVS displays that were not considered or ruled on by the Court in its August 2, 2007, Order.

The Court has issued a Scheduling Order. The parties are in the beginning stages of discovery, and trial is set to commence on January 12, 2009.

## II.    SUMMARY OF ARGUMENT

1.    To obtain a preliminary injunction Sun Optics must show that the balance of the following four factors weighs in favor of an injunction: (1) a reasonable likelihood that the '739 patent is valid, enforceable, and infringed by the CVS displays, (2) the prospect of irreparable harm to Sun Optics from FGX's infringing CVS displays, (3) a balance of the parties' hardships in the presence or absence of an injunction, and (4) consideration of public interests.

2.    The first factor, a reasonable likelihood of success on the merits of infringement of the '739 patent, weighs in favor of an injunction because FGX has not raised any substantial question regarding the validity or enforceability of the '739 patent, which is presumed valid and enforceable, and FGX's accused CVS displays have every limitation of at least claim 1 of the '739 patent.

3.    The second factor, the prospect of irreparable harm, weighs in favor of an injunction because FGX's infringement of the '739 patent creates insurmountable barriers to entry for Sun Optics's patented products in the mass merchandiser and national chain drugstore market segments. Further, FGX's infringing CVS displays are destroying the novelty of Sun Optics's patented displays, thereby undermining the marketing strategy

2

that Sun Optics took over four years to develop and implement. FGX's infringing CVS displays are also causing irreparable price erosion due to the presence of an infringing product and damage to the reputation of Sun Optics's patented Clear Case programs. No monetary damages can compensate Sun Optics for these irreparable harms.

4.    The third factor, the balance of the parties' hardships, weighs in favor of an injunction. First, this factor is presumed to weigh in favor of an injunction because of Sun Optics's strong showing of a likelihood of success on the merits. Second, FGX currently sells its reading glasses in numerous displays, such as on conventional hook and hanger displays, which are not accused of infringing any of Sun Optics's patents. Thus, FGX will be able to continue to market its reading glasses on conventional displays even if a preliminary injunction issues. On the other hand, if a preliminary injunction does not issue, substantial markets for reading glasses may be forever closed to Sun Optics, the patent holder, for the reasons set forth in paragraph three above.

5.    The fourth factor, the consideration of important public interests, weighs in favor of an injunction. First, the public has an important interest in upholding the patent system. Second, issuing a preliminary injunction will increase competition in the mass merchandiser and national chain drugstore reading glass market segments to the benefit of the consumer. No important public interest will harmed by the issuance of an injunction. Rather, the absence of an injunction in this instance will destroy legitimate competition in favor of the in favor of the infringing majority-market shareholder.

6.    The balance of the foregoing factors weighs in favor of issuing a preliminary injunction because each of the four factors weighs in favor of Sun Optics and issuance of an injunction.

## III.    STATEMENT OF FACTS

The present motion for preliminary injunction is based on FGX's accused CVS displays. As explained in detail below, FGX is using its infringing CVS displays for the specific purpose of excluding Sun Optics from competing with FGX in at least CVS, and

3

possibly other national chain stores. FGX's "exclusive" agreements with national chain drugstores and the nature of this market segment preclude Sun Optics from being able to compete with FGX in this market segment under circumstance where, as here, FGX offers an infringing alternative to Sun Optics's patented product. The present motion for a preliminary injunction stems from the urgent need to stop FGX's use of its infringing CVS displays before Sun Optics's opportunity to sell its patented products to CVS and other national chain drugstores is forever closed.

The CVS displays that are the subject matter of the present motion for preliminary injunction are significantly different from the Private Eyes countertop displays and eyeglass cases that were the subject of Sun Optics's prior motions for preliminary injunction. *Compare* Exh. B *with* Exh. C. The analysis forming the basis of the Court's prior Order finding a substantial question as to whether the Private Eyes countertop displays meet the "support member" element of the claims of the '739 patent does not apply to the infringement analysis of the CVS displays.

Critically, the present motion for preliminary injunction raises new issues of infringement on new products not previously considered by the Court. The present motion also presents new evidence of irreparable harm not previously considered by the Court.

### A.    Nature of the National Chain Drugstore and Mass Merchant Market Segments for the Reading Glass Industry

The total market for reading glasses in the United States is approximately $590 million a year. [Declaration of Bruce Raile filed contemporaneously herewith ("Raile Decl."), at p. 2, ¶ 4.] Of that $590 million, the mass merchant and chain drugstore market segments account for approximately $415 million, or approximately seventy percent (70%) of the total annual U.S. reading glass market. [*Id.*] FGX is by far the largest reading glass supplier in America, and is already the primary vendor in more than fifty percent (50%) of the mass and chain drugstore market segments. [*Id.*]    To further

increase its market share, FGX recently bought Magnivision, which was FGX's largest reading glass competitor in America. [*Id.*]

The barriers to entry into the mass merchant and chain drugstore market segments are numerous. [*Id.* at p. 2, ¶ 5.] First, most mass merchants and chain drugstore retailers (collectively "Retailers") purchase their reading glasses from a limited number of vendors, typically using only one primary vendor. [*Id.*] This is because it costs the Retailer time and money to manage each vendor relationship. [*Id.*] In other words, the more vendors that a Retailer uses, the more time and money it must spend to manage the various vendor relationships. [*Id.*] Second, it is expensive for Retailers to change primary vendors because entire new relationships must be developed, new displays must be built and installed, and new protocols for doing business must be implemented. [*Id.*] Finally, Retailers establish allegiances with their primary reading glass vendors fearing they might actually lose business if they were to switch to a new primary vendor that could not supply their customers' demands. [*Id.*] These aspects of the mass merchant and chain drugstore markets are significant barriers for new vendors to gain entry into this market. [*Id.*]

Because Retailers traditionally purchase from only one primary reading glass vendor, the primary vendors engage in fierce competition to replace each other within a Retailer. [*Id.* at p. 3, ¶ 6.] To protect their market share, some primary reading glass vendors, including FGX, offer incentives to Retailers to sign long-term "exclusive" vendor contracts. [*Id.*] These exclusive contracts typically exclude all other vendors, unless another vendor can provide something unique and different that the Retailer cannot purchase from their "exclusive" primary vendor. [*Id.*]

The existence of long-term "exclusive" contracts and the common practice of Retailers purchasing from one primary reading glass vendor are substantial barriers for any new vendor attempting to break into the mass merchant and chain drugstore market segments. [*Id.* at p. 3, ¶ 7.]

**B.    Sun Optics's Patents Are the Foundation of Its Marketing Strategy to Offer Unique and Proprietary Products in Order to Overcome the Barriers to Entering the Mass Merchant and National Chain Drugstore Market Segments**

To overcome these barriers, Sun Optics developed a specific marketing strategy to create a niche for a "Secondary Vendor" based on unique, high quality, patent-protected products, not available from other vendors. [Raile Decl., at p. 3, ¶ 7.] Rather than take the traditional approach of trying to replace the primary vendor, Sun Optics's marketing strategy created a unique, exclusive secondary program to give the Retailer incremental sales while merchandised right alongside the primary vendor's program. [*Id.*]

The most critical factor for Sun Optics's marketing strategy to be successful is that its patented program must be available exclusively from Sun Optics. [*Id.* at p. 3, ¶ 8.] To gain the Retailers' interest, and to justify the Retailers' increased managerial expenses, Sun Optics's secondary program must be unique, new, exiting, and, most importantly, available exclusively from Sun Optics. [*Id.*] If Sun Optics's patented products are available from the current primary vendor, there is little or no incentive for the Retailer to give Sun Optics's program a chance. [*Id.*] Rather than incurring the additional expense of adding Sun Optics as a secondary vendor, Retailers will simply buy the new program, albeit an infringing product, from their current primary vendor. [*Id.*] However, if Sun Optics is the exclusive supplier of its top-selling patented products and displays, then Retailers have an incentive to add Sun Optics's products to their current reading glass program. [*Id.*] With this marketing strategy, Sun Optics has overcome some of the existing barriers to entry into the mass merchant and drugstore markets as a secondary reading glass vendor. [*Id.*]

To this end, Sun Optics spent four years and countless hours inventing and obtaining patent protection on new styles, cases, and displays for reading glasses. [*Id.* at p. 4, ¶ 9.] For Sun Optics's marketing strategy to work, its reading glasses, cases and displays must be top-selling, organized, convenient, new, fashion forward, eye catching, instantly recognizable as a quality product, and, above all, available only from Sun

6

Optics. [*Id.*] Thus, Sun Optics sought and obtained patent protection for the fruits of its inventive efforts in the form of the '427, '180, '739 and other patents. [*Id.*]

As regards the '739 patent at issue here, Sun Optics invented cases and displays that allow the consumer to easily browse numerous reading glasses to identify those that appeal to the particular consumer without removing the glasses from the display. [*Id.* at p. 4, ¶ 10.] This is done by displaying the glasses in cases and on displays that allow the consumer to view at least a portion of the reading glasses without removing them from the display. [*Id.*] The displays are also configured such that they tend to remain neat and organized because the reading glasses can easily be removed from and returned to openings in the displays. [*Id.*] Sun Optics markets these new innovative display systems as the "Clear Tube" or "Clear Case" reading glass programs because the displays and cases are designed to allow the consumer to see a portion of the reading glasses through the "clear" portion of the cases without having to remove the cases from the display. [*Id.*] These patented displays have been the primary tool that has enabled Sun Optics to overcome the significant barriers to entry into the mass merchant and chain drugstore market segments for reading glasses. [*Id.*]

**C.    Sun Optics's Marketing Strategy Based on Its Patents Has Been Successful**

In 2001, Sun Optics used its Clear Case program, then patent-pending and now covered by the '739 patent, to open an account with the East Coast division of Rite Aid drugstores.[3] [*Id.* at p. 5, ¶ 11.] Based on Sun Optics's Clear Case reading glass program, Rite Aid gave Sun Optics a unique opportunity to become a secondary vendor by allotting Sun Optics approximately fifteen percent (15%) of its reading glass program, with the remainder of the program going to FGX. [*Id.*] Rite Aid allowed Sun Optics this unique opportunity to become a secondary vendor because FGX did not offer anything similar to Sun Optics's Clear Case program. [*Id.*]

---

[3] The Rite Aid national chain of drugstores is divided into two divisions, the East Coast and West Coast.

Over the next four years, Sun Optics's Clear Case program competed side-by-side with FGX's conventional reading glass program at Rite Aid. [*Id.* at p. 5, ¶ 12.] By the end of this four year period, Sun Optics's Clear Case program was outperforming FGX's traditional reading glass program by a margin of 3.2 to 1 in sales per square foot. [*Id.*] Apparently recognizing the added value that Sun Optics's Clear Case program provided, in 2005 Rite Aid increased Sun Optics's portion to approximately twenty five percent (25%) of the reading glass program in its East Coast division at the expense of FGX. At the same time, Rite Aid also expanded Sun Optics's Clear Case program to the additional stores in its West Coast division, (serviced by a different primary vendor other than FGX). [*Id.*] Sun Optics's Clear Case program continues to outperform FGX's traditional reading glass program in sales per square foot at Rite Aid to this day. [*Id.*]

### D.    FGX Is Infringing the '739 Patent to Thwart Sun Optics's Attempts to Expand Its Distribution of Its Patented Products

FGX is expanding its infringement of Sun Optics's patents to compete directly with Sun Optics's patented products in an increasing number of markets. [Raile Decl., at p. 1, ¶ 3.] FGX's infringement of Sun Optics's patents began with its Private Eyes line of products sold in the Optical market. [*Id.*] As demonstrated by FGX's and Sun Optics's respective advertisements in the optical trade journal *Vision Monday*, a copy of which is attached as Exhibit A to the Raile Declaration, FGX's infringing Private Eyes products compete directly with Sun Optics's patented products in the Optical market. [*Id.*] In fact, FGX is now selling its accused Private Eyes products through at least three of the same distributors to the Optical market that were previously marketing Sun Optics's patented products, namely; Pech Optical, Kasperek Optical, and Central Optical. [*Id.*] Now, FGX is expanding its distribution of products that infringe on Sun Optics's patents into the mass merchant and chain drugstore market segments resulting in incalculable harm to Sun Optics. [*Id.*]

FGX is expanding its distribution of products that infringe on Sun Optics's patents to foreclose opportunities for Sun Optics to increase its distribution of its patented products. In response to Sun Optics's success with its Clear Case program at Rite Aid, Jack Flynn, the President of FGX, told Sun Optics that "the gloves are off" with regard to sharing any future display space with Sun Optics. [*Id.* at p. 5, ¶ 13.]

Since Sun Optics's success at Rite Aid and the subsequent threat by FGX's President, Sun Optics's efforts to expand its Clear Case program to other FGX Retailer customers has been thwarted. [*Id.* at p. 5, ¶ 14.] For example, in approximately November 2005, Sun Optics opened a dialog with CVS to sell Sun Optics's patented Clear Case reading glass program to CVS. [*Id.*] Initially, CVS demonstrated serious interest in Sun Optics's products and displays because they were conceptually different from anything that FGX offered or sold in CVS drugstores, and the negotiations between Sun Optics and CVS were progressing nicely. [*Id.*] However, in approximately September 2006, the communication lines with CVS went cold. [*Id.*]

Shortly after the communication lines with CVS turned cold, Sun Optics learned of information causing Sun Optics to suspect that FGX had offered CVS a new reading glass program that would infringe the claims of the '739 patent. [*Id.* at p. 6, ¶ 15.] Sun Optics apprised the Court that Sun Optics believed that FGX was expanding its infringement of the '739 patent to CVS drugstores, and argued that this expansion was additional evidence of the irreparable harm FGX's infringement was causing Sun Optics. *See* Notice of Evidence attached to Motion for Leave to File Evidence Arising after Oral Arguments in Support of Plaintiff's Motions for Preliminary Injunction (D.I. 48). FGX emphatically denied these allegations, arguing that Sun Optic had no direct evidence to support its allegations, and representing to the Court that it was not planning on placing any product "at issue in this case" in CVS drugstores. [5/18/07 Transcript, at 62:9-63:25.] Not long afterward, in July of 2007, Sun Optics discovered that FGX had in fact introduced infringing products at CVS [Raile Decl., at p. 6, ¶ 15,] despite its prior

9

representations to the Court that it was not planning on selling any such accused product to CVS. Pictures of FGX's infringing displays at CVS are attached as Exhibit B to the Raile Declaration. [*Id.*]

Sun Optics had a similar experience with the Duane Reade chain of drugstores. [*Id.* at p. 6, ¶ 16.] In approximately August 2006, Sun Optics approached Duane Reade to sell Sun Optics's patented Clear Case program in its drugstores. [*Id.*] Again, Duane Reade initially expressed serious interest in Sun Optics's patented program. [*Id.*] In approximately November 2006, Duane Reade turned Sun Optics down claiming to be able to get a similar program from FGX, their current primary reading glass vendor. [*Id.*]

Having destroyed Sun Optics's exclusivity on its patented Clear Case program, FGX has made good on the word of Jack Flynn and has effectively prevented its Retailer customers from considering Sun Optics's patented products through offering infringing duplicates of the Sun Optics patented products, thereby blocking Sun Optics from rightfully expanding into the mass merchant and chain drugstore market segments, even as a secondary vendor.

## IV.   **INTRODUCTION**

Sun Optics is aware of the imposition on the time of the Court that motions for preliminary injunction impose. Consequently, it is only after careful consideration that Sun Optics brings the present motion for preliminary injunction in an effort to preclude FGX from inflicting further incurable injury to the business of Sun Optics. FGX's introduction of its infringing CVS display into markets wherein FGX has exclusive contracts is poisoning Sun Optics's chance of ever entering those markets to compete with FGX. To prevail at trial currently set for January 2009, or even on a motion for summary judgment, which the Court has scheduled to hear August 1, 2008, will be too late to remedy the irreparable harm being caused by FGX's ongoing infringement. Thus, in an effort to preserve Sun Optics's opportunities to overcome the barriers to entering the mass merchant and national chain drugstore market segments, Sun Optics pleads the

10

Court in the accompanying Motion for Preliminary Injunction to enter an order enjoining FGX from making, using, selling, offering to sell or importing the CVS display, or any colorable imitations thereof, in or into the United States, pending the outcome of this action.

## V.    STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

As explained in its prior motions for preliminary injunction the standard for obtaining preliminary injunctive relief in patent cases requires the analysis of four factors:  (1) a reasonable likelihood that Sun Optics will prevail on its infringement claim, (2) the prospect of irreparable harm to Sun Optics from FGX's infringing CVS displays, (3) a balance of the parties' hardships in the presence or absence of an injunction, and (4) consideration of public interests. *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000); *see also* Fed.R.Civ.P. 65; 35 U.S.C. § 283. As shown below, the balance of these factors weighs heavily in favor of a preliminary injunction.

## VI.    ARGUMENT

### A.    Sun Optics Is Likely to Prevail on the Merits of Infringement and Validity

To establish a likelihood of success on the merits Sun Optics must make a showing with respect to both validity of the '739 patent and infringement by the Accused Products. *Hybritech, Inc. v. Abbott Lab.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988).  Sun Optics need *not*, however, establish a likelihood of success "beyond question." *Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985).  To satisfy this burden Sun Optics needs to make merely a "clear showing" on infringement and validity. *Id.* This burden is *less* than the burden required for a grant of summary judgment. *See, New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 n.4 (Fed. Cir. 1992) ("[T]he movant in a preliminary injunction proceeding need not present sufficient evidence to be entitled to summary judgment in its favor.")

1.     **Sun Optics is likely to succeed on its claim of infringement of the '739 patent by FGX's CVS displays**

Sun Optics is likely to succeed on the merits of its claim of literal infringement of the '739 patent by FGX's CVS displays. A comparison of the CVS display with the claims of the '739 patent clearly demonstrates that each and every limitation of claim 1 is satisfied, as explained below.

a)     **Legal standards for infringement of utility patents**

To determine whether a particular device is covered by a claim, a two-step analysis is required by the courts. "In the first step the court 'construes' the patent claims by establishing the scope and boundaries of the subject matter that is patented, as a matter of law, and in the second step the trier of fact applies the construed claims to the accused device." *Netword, LLC v. Central Corp.*, 242 F.3d 1347, 1350 (Fed. Cir. 2001).

On the issue of claim interpretation, the tenants of claim construction relevant to the present case have been set forth at pages eight and nine of Plaintiff's Memorandum in Support of Its Motion for a Preliminary Injunction (D.I. 24), incorporated herein by reference. In short, claims must be construed in context, looking first to the language of the claims themselves, then to the written description and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-1316 (Fed. Cir. 2005) (*en banc*). Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Claim 1 of the '739 patent reads as follows:

1. An eyeglass display comprising:

a support member;

one or more display members having a plurality of openings, wherein each of said plurality of openings is adapted to receive an eyeglass case and is configured to permit a consumer to view at least a portion of the eyeglasses enclosed therein, wherein at least one eyeglass case is received by one of said plurality of openings and is displayed in a substantially vertical manner, said eyeglass case comprising,

a body adapted to enclose a pair of eyeglasses, said body have [sic] a first component and a second component, said second component

12

having a substantially flat surface at one end thereof, said body
configured to permit a consumer to observe at least-a [sic] portion of
the pair of eyeglasses enclosed within said body, wherein said
substantially flat surface at said one end of said second component
permitting said eyeglass case to be positioned on said substantially flat
surface at said one end of said second component in a substantially
vertical manner.

### b)    The "eyeglass display" language

The preamble of claim 1 refers to an "eyeglass display." The specification
explains that an eyeglass display is "a display 100 for displaying eyeglasses." '793
patent at 6:50-51, Fig. 5. FGX's CVS eyeglass displays are undisputedly displays for
displaying eyeglasses.

### c)    The "display member" limitation

The "display member" must have "a plurality of openings . . . adapted to receive
an eyeglass case" and be "configured to permit a consumer to view at least a portion of
the eyeglasses enclosed therein[.]" *Id.* at claim 1. The "display member" must also
display the eyeglass case in a "substantially vertical manner" when the eyeglass case is
"received" by one of the openings. *Id.* A "display member" is depicted as parts 130a-
130h of Figure 6 of the '739 patent. The specification explains that the "display
member" "is positioned in a substantially horizontal manner" and "permits the eyeglasses
to be displayed in a vertical manner." *Id.* at 7:1-13. The clear language of the claim also
requires the display member to be configured such that a consumer can view "at least a
portion of the eyeglasses" when eyeglass cases are placed in the openings. Thus, the
"display member" limitation should be construed to be "a structure with openings to
receive eyeglass cases such that the eyeglass cases are retained in a substantially vertical
position when placed in the openings, and at least a portion of the eyeglasses are visible."

FGX's CVS displays incorporate several "display members" that satisfy the
requirement of claim 1. The display members of the CVS displays are seen in the picture
below as the structures with turquoise edges holding the eyeglass cases in a substantially
vertical position. One of the "openings" that receives an eyeglass case is clearly visible

13

on the bottom display member. The picture also demonstrates that the shape of the openings is specifically adapted to receive the eyeglass cases. Finally, the display members of the CVS display are configured such that the eyeglasses are clearly visible inside the cases when the cases are placed in the openings of the display member. The "display member" limitation is indisputably met as shown below:



d)    The "support member" limitation

In ruling on Sun Optics's prior motions for preliminary injunction, the Court issued a preliminary construction of the "support member" limitation as "a structure for securing other components of the display." [4]  8/2/07 Order, at p. 6. Because the Court's construction contains an unnecessary ambiguity, Sun Optics respectfully submits that the Court should refine its construction to more closely conform to the claim language as follows: "a structure *to which* other components of the display *are secured.*"

---

[4] In footnote 5, the Court states, "The specification goes on to state that '[d]isplay member 130 is coupled to support structure 120 and/or base 110.' ('739 patent, col.6, l.67 – col. 7, l.1)  Plaintiff argues that the above language demonstrates that a 'support' member need not be function." 8/2/07 Order, at p. 5 n.5. The Plaintiff respectfully disagrees that is has ever taken the position that the "support member" does not need to support anything. Plaintiff's proposed construction of "support member" was "a frame for supporting one or more other components of the display." Plaintiff's Reply Memorandum in Support of Its Motion for Preliminary Injunction, at p. 3. Plaintiff's position has been, and continues to be, that FGX's proposed claim construction *requiring* the display member to be coupled to the "support member" was, and is, erroneous. *See id.*, at pp. 2-4.

Under the Court's construction, an argument exists that the "support member" must perform the act of "securing." The clear teaching of the specification, as demonstrated in the quotations from the specification quoted by the Court in its Order, the "support member" is a structure *to which* other components of the display are secured. Thus, other components of the display may be secured to the support member with any number ways, such as with bolts, nails, adhesives, welds, etc.; and an argument for no infringement exists under the Court's prior construction because at least some of these fastening methods may be argued as something other than a "structure," such as an adhesive, that performs the act of securing. Any unnecessary ambiguity is easily remedied by modifying the Court's construction to "a structure *to which* other components of the display *are secured*." This slight change in the Court's construction eliminates an unnecessary ambiguity, and better aligns the Court's construction with the clear meaning found in the specification. Incidentally, this modified construction also comports with Sun Optics's previously proposed construction that "support member" means "a frame for supporting one or more other components of the display." [Plaintiff's Reply Memorandum in Support of Its Motion for Preliminary Injunction (D.I. 41), at p. 3.]

Regardless of whether the Court updates and refines its prior construction as argued above, the CVS display meets the "support member" limitation under each of the constructions discussed. The long white vertical support member of the CVS displays depicted below is the support member to which the display members are secured. Alternatively, the fasteners that secure the turquoise display members to the white support member are also "structures" securing the display members. Thus, the white frame depicted below satisfies the "support member" limitation:



e)        The "eyeglass case" limitation

The "eyeglass case" of claim 1 requires 1) a "body" having a "first component and a second component" that are "adapted to enclose a pair of eyeglasses" and "permit a consumer to observe at least a portion of the eyeglasses enclosed within said body"; and 2) a "second component" that has a "substantially flat surface at one end" permitting the eyeglass case "to be positioned on said substantially flat surface . . . in a substantially vertical manner." *Id.* at claim 1.

The eyeglass cases of FGX's CVS display satisfy the "eyeglass case" limitation. First, FGX's CVS eyeglass cases have a "body" with a "first component" and "second component" that are "adapted to enclose a pair of eyeglasses." The "first component" is the removable black top. The "second component" of the CVS eyeglass case is the transparent tube with the substantially flat black bottom, which is permanently attached to the transparent tube. Thus, the CVS eyeglass cases literally satisfy the eyeglass case limitation, as shown below:



FGX's CVS displays literally satisfy the "eyeglass case" limitation, as the foregoing analysis demonstrates. The CVS eyeglass cases have two components, the second component having a flat surface that allows the cases to be displayed vertically, and a clear portion that allows the consumer to see at least a portion of the eyeglasses inside. Sun Optics has overwhelmingly demonstrated that it is likely to prevail on its claim that the CVS displays infringe claim 1 of the '739 patent.

### 2.    The claims of the '739 patent are valid and enforceable

In addition to providing a strong showing of likelihood of success on the merits for the question of infringement, Sun Optics is also likely to succeed on the issue of the validity of claim 1. First, all of the claims of the '739 patent are presumed valid. *See* 35 U.S.C. § 282. Importantly, this presumption exists at every stage of the proceedings, including the preliminary injunction stage, *Canon Computer Sys. Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998), and the party challenging validity (here FGX) bears the burden of establishing invalidity by clear and convincing evidence, *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993). "Thus, where the challenger fails to identify any persuasive evidence of invalidity, the

very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Sys.*, 134 F.3d at 1088. FGX has yet to articulate any specific allegation of invalidity of any claim of the '739 patent. Thus, there is no substantial question regarding the validity of the claims of the '739 patent, and Sun Optics is likely to succeed on the issue of validity at trial.

As regards enforceability of the '739 patent, FGX has raised allegations that the '739 patent is not enforceable due to inequitable conduct. *See* Defendants' [sic] Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction (D.I. 38), at 19-20. Specifically, FGX alleges that Sun Optics failed to disclose to the PTO "any of the known eyeglass cases or the associated displays" that are referred to in the specification itself. *Id.* Sun Optics specifically addresses these allegations at pages 10-13 of Plaintiff's Reply Memorandum in Support of Its Motion for Preliminary Injunction (D.I. 41), incorporated herein by reference. In short, FGX has identified no specific reference, material or otherwise, that Sun Optics withheld from the U.S. Patent and Trademark Office ("PTO") during prosecution of the application that resulted in the '739 patent. Further, FGX has identified no evidence that any such withholding was done with an intent to deceive the PTO. To the contrary, that the unidentified reference FGX alleges was withheld from the PTO is admittedly described in the specification of the '739 patent is evidence that any such withholding was done without an intent to deceive the PTO. FGX's allegations of inequitable conduct simply do not raise a "substantial question" as to the enforceability of the '739 patent, and this factor weighs in favor of Sun Optics.

**B.    Sun Optics is Suffering Irreparable Harm Because of FGX's Continuing Infringement of the '739 Patent[5]**

FGX's infringing CVS displays are specifically aimed at precluding Sun Optics from competing with FGX in the mass merchant and national chain drugstore market segments.  FGX's infringement is undermining a marketing strategy that Sun Optics spent four years developing and implementing.  FGX is also using its infringement to create barriers that exclude Sun Optics from being able to market its patented products.  A monetary figure adequate to compensate Sun Optics can not be attached to these types of irreparable harm.

**1.    Destruction of Sun Optics's Marketing Strategy**

As established above, primary vendors marketing conventional displays for reading glasses face as least the following significant barriers to entering the mass merchant and nation chain drugstore market segments: 1) overcoming the Retailers' allegiance to the incumbent primary vendor; 2) demonstrating that the new vendor can meet the supply demands for such large accounts; 3) the expense and hassle of implementing new business protocols and switching out the old products and displays; 4) the expense incurred by the Retailer to develop a relationship with the new vendor; and 5) circumventing "exclusive" contracts between incumbent vendors and Retailers that allow Retailers to purchase reading glasses from a different vendor only if the incumbent vendor can not, or will not, provide the same or similar product offered by the new vendor.

Rather than joining the fierce competition of primary vendors to overcome these barriers to entry and oust each other from accounts with Retailers, Sun Optics developed

---

[5] Sun Optics continues to argue that a presumption of irreparable harm arises from a strong showing of success on the merits. *See Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556-57 (Fed. Cir. 1994).  However, because the parties have already argued this legal issue in connection with its previous motions for preliminary injunction, and the Court having rejected Sun Optics's argument in its August 2, 2007, Order, Sun Optics merely raises the issue here to preserve the issue for review on appeal should the need arise.

a marketing strategy that avoids many of these barriers to entry altogether. Sun Optics's marketing strategy was to create a "secondary vendor" niche by developing new patented products and designs available only from Sun Optics so that it did not have to oust incumbent primary vendors to gain market share.

Sun Optics's marketing strategy of creating a secondary vendor niche circumvents several of the barriers to entry faced by other primary vendors attempting to break into the mass merchant and national chain drugstore market segments. Specifically, because Sun Optics is merely a secondary vendor it does not need to convince Retailers to wholly abandon their allegiances to their primary vendors. Sun Optics also need not demonstrate that it can meet all of the supply demands of Retailers because the primary vendor also continues to supply reading glasses to the Retailer. Consequently, the Retailers do not need to replace old products and displays because Sun Optics's displays are marketed in addition to the displays of the primary vendor. Finally, the Retailers are not bound by "exclusive" contracts, such as those used by FGX, because Sun Optics is the only vendor that can legally provide its patented products.

However, this entire strategy hinges on Sun Optics's ability to be the exclusive provider of its patented products. To justify the Retailers' increased managerial expenses of adding a secondary vendor, overcome the Retailers' allegiance to their primary vendor, and circumvent existing "exclusive" contracts between Retailers and vendors, Sun Optics's must be the exclusive source of its patented products. If Sun Optics's patented products are made improperly available from incumbent primary vendors, Retailers have no incentive to carry Sun Optics's products. Rather than incurring the additional expense of adding Sun Optics as a secondary vendor, Retailers will simply buy the infringing products and displays from their current primary vendor. However, if Sun Optics is the exclusive supplier of its top-selling patented products and displays, then Retailers have an incentive to add Sun Optics's products to their current reading glass program.

Sun Optics's marketing strategy has been successful. In 2001, Rite Aid allotted approximately fifteen percent (15%) of the reading glass program in its East Coast division to Sun Optics because its primary vendor for the East Coast division, FGX, did not offer a Clear Case program. Four years later, Rite Aid increased Sun Optics's portion of the West Coast reading glass program to twenty five percent (25%) because Sun Optics's display was outselling FGX's conventional display by a margin of 3.2 to 1 per square foot. At that time, Rite Aid also extended Sun Optics's Clear Case program to its West Coast division of stores.

Seeing first hand the success of Sun Optics's marketing strategy and patented displays, FGX saw a need to protect its accounts with other Retailers. Indeed, Jack Flynn, the president of FGX, told Sun Optics that "the gloves are off" with regard to sharing any future display space with Sun Optics. Shortly after this threat by FGX's president, FGX began offering products that infringe the '739 patent with the specific intent of destroying the incentives of Retailers to use a secondary vendor.

FGX's efforts to undermine Sun Optics's marketing strategy of creating a "secondary vendor" niche have been successful. It happened first with CVS. Sun Optics had been working with CVS for nearly a year to open an account with CVS as a secondary vendor. These negotiations ceased unexpectedly in approximately September 2006. By July 2007, Sun Optics discovered FGX's infringing displays in CVS. The reason that CVS stopped negotiating with Sun Optics is obvious – CVS could get an infringing product from its current vendor, FGX.

Sun Optics had a similar experience with Duane Reade drugstores. Sun Optics approached Duane Reade, a current customer of FGX, to allow Sun Optics to be a secondary vendor. Duane Reade turned Sun Optics away because it claimed it could purchase a Clear Case program FGX.

As demonstrated by Sun Optics's experiences with CVS and Duane Reade, FGX's infringement of the '739 patent has completely undermined the marketing strategy

Sun Optics took over four years to develop and implement. Retailers simply do not have an incentive, or in some cases a legal right, to use Sun Optics as a secondary vendor if they can purchase infringing products from their primary vendors.

FGX's destruction of this marketing strategy is irreparable harm. No monetary value can ever be attached to the destruction of Sun Optics's marketing strategy. Only by issuing a preliminary injunction against FGX's CVS displays can this Court prevent irreparable harm from occurring and prevent FGX's stifling impact on legitimate competition in this market.

        **2.**      **FGX's Infringement Raises the Barriers to Entry that Exclude Sun Optics from the Market**

The natural and intended consequence of FGX's infringing activities is to preserve the barriers to entering the mass merchandiser and national chain drugstore market segments that have previously prevented smaller and midsize vendors, such as Sun Optics, from making inroads into this $425 million market segment. As the vendor that currently services over fifty percent (50%) of these market segments, it makes sense for FGX to protect its market share by shoring up and preserving barriers to entering these market segments.

As explained above, Sun Optics's marketing strategy was to create a new "secondary vendor" niche to avoid having to directly confront and overcome the numerous barriers to entering the mass merchandiser and national chain drugstore market segments. FGX has used improper means to destroy that marketing strategy through infringement, thus eliminating Sun Optics's proper exclusivity for offering its patented Clear Case programs. Having removed the incentive of its Retailers to use a secondary vendor, Sun Optics is again faced with the very insurmountable barriers to entry that it sought to avoid with its proprietary marketing strategy. In other words, FGX's infringement raises the barriers to entry that the exclusivity of Sun Optics's patented

products allowed it to circumvent, thereby excluding Sun Optics from competing for any portion of the over $200 million market share controlled by FGX.

### 3.    A Permanent Injunction After Trial Will Not Be Adequate Relief Because the Clear Case Concept May Be Ruined

A permanent injunction after a trial on these issues will not be an adequate remedy because by that time the concept of Clear Case displays may be ruined. If FGX does not execute Sun Optics's patented invention such that it achieves significantly higher sales as compared to conventional displays, Retailers will be unlikely to switch out FGX's infringing Clear Case displays for Sun Optics's displays even should a permanent injunction issue after trial.

As stated by the Federal Circuit, FGX is changing the marketplace in ways such that "it may be impossible to restore [Sun Optics's] exclusive position by an award of damages and a permanent injunction." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996). Even should a permanent injunction issue after trial, Sun Optics will likely face a new barrier to obtaining accounts with the Retailers, such as CVS, that have carried FGX's infringing displays. Although FGX's CVS displays infringe the claims of the '739 patent, FGX's infringing displays are unlikely to have the same level of success as Sun Optics's displays have obtained in the drugstore market segment. For example, the cases FGX uses in its displays are not sized properly for the glasses placed therein. FGX's cases are so large compared to the reading glasses therein that the reading glasses must be placed on plastic sheets to prevent the reading glasses from rattling around the inside of the case. The unnecessarily large cases also make the cases more difficult to carry and store. FGX's cases do not fit conveniently in a suit coat or pant pocket, as do Sun Optics's cases. FGX's displays also lack the upscale look and appeal of Sun Optics's displays. For the reasons set forth above, among others, FGX's infringing displays simply are not likely to sell as well as Sun Optics's patented displays.

If FGX's infringing products do not provide the type of significant added value that Sun Optics's products have provided at stores such as Rite Aid, the Clear Case concept may be ruined by FGX's infringing displays by the time of trial. Consequently, even if a preliminary injunction should issue, Sun Optics will continue to have a difficult time obtaining accounts with Retailers who have carried FGX's infringing products. The Retailers' view of the Clear Case concept will have been tainted by their experience with FGX's infringing products. Thus, the opportunity for Sun Optics to place its patented products in these stores may be lost forever. It is impossible to assign a monetary damage to this type of lost opportunity. The damage is incalculable, making the harm irreparable. *See Reebok Int'l v. J. Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994) ("Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure.")

The foregoing substantial irreparable harm Sun Optics will suffer if an injunction does not issue tips this factor in favor of Sun Optics.

### C.    The Balance of Hardships Favors an Injunction

As with the irreparable harm caused by FGX's infringement, the balance of the hardships favors issuance of a preliminary injunction. First, the harm of an injunction on FGX will be minimal. FGX currently has displays for reading glasses in CVS stores that are not accused of infringing the '739 patent. Consequently, FGX will be able to continue to market its reading glasses in CVS stores without interruption even should a preliminary injunction issue. The only harm to FGX will be the cost of removing the accused CVS displays from the stores. However, this cost may be compensated and merits no consideration because it is part of the risk FGX accepted when it released its infringing CVS displays despite being in a current lawsuit over the claims of the '739 patent. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997).

24

The harm to Sun Optics, on the other hand, is substantial. As explained above, if a preliminary injunction does not issue forthwith then Sun Optics may be forever precluded from selling its products in the substantial market segments currently locked up by FGX's exclusive contracts and infringing products. The longer FGX is allowed to service these markets with its infringing displays, the less likely are the chances that these customers will be inclined to give Sun Optics a chance to compete with FGX in their stores. In short, Sun Optics will continue to suffer all of the irreparable harm set forth in detail above. The balance of the hardships overwhelmingly weighs in favor of an injunction.

### D.    The Public Interest Favors Sun Optics and Entry of an Injunction

As the Court stated in its August 2, 2007, Order, "[a]bsent any other relevant concerns, the public interest factor is generally bound to the likelihood of success on the merits, as it is in the public interest to enforce valid and infringed patents[.]" Order (D.I. 56), at p. 3 (citing *Abbott Labs. v. Andrx Pharms, Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006)). Where, as here, there is a strong showing of infringement and invalidity, courts generally find that the public interest in a patent case is strongly weighted toward protecting the rights of patent holders.

The public also has an interest in fair competition in the marketplace. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990) (recognizing the "right to compete" as a legitimate public interest). In the typical case, issuance of a preliminary injunction inhibits competition because the accused infringer is precluded from selling the infringing device. *See id.* This case is just the opposite. Allowing FGX to continue to infringe the claims of the '739 patent with its CVS displays is to preclude *Sun Optics* from competing with FGX in over 6,000 of CVS drugstores. On the other hand, enjoining FGX's CVS displays will open a door of opportunity for Sun Optics to break through FGX's exclusive contracts and to sell its reading glasses on its patented displays side-by-side with FGX's reading glasses marketed on conventional and non-

infringing displays. Thus, enjoining FGX will actually *increase* competition, to the benefit of the public. The public interest factor weighs in favor of entering an injunction, to further the public interests of supporting the patent system and of encouraging competition in the marketplace.

## VII.    CONCLUSION

Based on the foregoing, Sun Optics respectfully requests that the Court grant its motion for a preliminary injunction and preliminarily enjoin FGX from making, using, selling, or importing into the United States its CVS displays, or colorable imitations thereof, that infringe the claims of the '739 patent.

Respectfully submitted

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: /s/ R. Eric Hutz
    R. Eric Hutz (#2702)
    The Nemours Building
    1007 N. Orange Street
    P. O. Box 2207
    Wilmington, DE 19899
    Telephone: (302) 658-9141
    *Attorneys for Plaintiff*
        *Sun Optics, Inc.*

**OF COUNSEL**:
LARRY R. LAYCOCK
CHAD E. NYDEGGER
**WORKMAN | NYDEGGER**
1000 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah 84111
Telephone: (801) 533-9800
*Attorneys for Plaintiff SUN OPTICS, INC.*

**DATE:** October 26, 2007

26

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUN OPTICS, INC., a Utah Corporation, )
                               )
         Plaintiff, )
                               )
     v. )                  Civil Action No.  1:07cv137 SLR
                               )
FGX INTERNATIONAL, INC., a Delaware )
Corporation, )
                               )
         Defendant. )
                               )
                               )

## CERTIFICATE OF SERVICE

     I, R. Eric Hutz, hereby certify that on October 26, 2007 I caused to be

electronically filed a true and correct copy of the foregoing with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record.

> Donald J. Detweiler, Esquire (I.D. 3087)
> Sandra G. M. Selzer, Esquire (I.D. 4283)
> **GREENBERG TRAURIG, LLP**
> The Nemours Building
> 1007 North Orange Street
> Suite 1200
> Wilmington, DE 19801
> *Attorneys for defendant*
>     *FGX International, Inc.*

I further certify that on October 26, 2007, I caused a copy of the foregoing to be served

by hand delivery on the above-listed counsel of record.

> /s/ R. Eric Hutz
> R. Eric Hutz (#2702)

# EXHIBIT A



US007188739B1

(12) **United States Patent**
Raile

(10) Patent No.: **US 7,188,739 B1**
(45) Date of Patent: **Mar. 13, 2007**

(54) **EYEWEAR CASE AND DISPLAY METHOD**

(75) Inventor: **Bruce Raile**, Park City, UT (US)

(73) Assignee: **Sun Optics, Inc.**, Salt Lake City, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/360,264**

(22) Filed: **Feb. 6, 2003**

**Related U.S. Application Data**

(60) Provisional application No. 60/433,724, filed on Dec. 13, 2002.

(51) Int. Cl.
*A47F 7/02* (2006.01)

(52) U.S. Cl. .......................................... **211/85.1**

(58) Field of Classification Search ............. 211/85.1;
248/902; 206/5, 6
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 246,460 A | 8/1881 | Chase et al. | |
| 1,092,156 A | 4/1914 | Mathis | |
| 2,606,708 A | 8/1952 | Irvan | |
| 2,713,947 A | 7/1955 | Foster | |
| 2,735,597 A | 2/1956 | Treleven | |
| 2,747,760 A * | 5/1956 | Jacobson | 220/475 |
| 2,809,766 A | 10/1957 | Anderson | |
| 2,816,666 A | 12/1957 | Nadel | |
| RE24,571 E | 11/1958 | Nadel | |
| 2,936,897 A | 5/1960 | Bloch | |
| 2,966,271 A | 12/1960 | Nadel | |
| 3,333,709 A | 8/1967 | Leblanc et al. | |
| D208,469 S | 9/1967 | Parker | |
| 3,357,568 A | 12/1967 | Leblanc et al. | |
| 3,593,856 A | 7/1971 | Zander | |
| 3,817,392 A * | 6/1974 | Bloch | 211/85.1 |
| 3,857,482 A | 12/1974 | Shelton | |
| 3,866,800 A | 2/1975 | Schmitt | |
| 4,000,810 A | 1/1977 | Leblanc | |
| 4,204,602 A | 5/1980 | Dunchock | |
| D267,992 S | 2/1983 | Shelton | |
| D275,160 S | 8/1984 | Shelton | |
| D275,161 S | 8/1984 | Shelton | |
| 4,572,366 A | 2/1986 | Carson | |
| 4,614,272 A | 9/1986 | Shelton et al. | |
| D285,462 S | 11/1986 | Sender et al. | |
| 4,715,575 A | 12/1987 | Kamerer | |

(Continued)

OTHER PUBLICATIONS

Pocket Clip & Tube Readers, Insight Eyeworks, circa Oct. 2001, 2 pages.

Primary Examiner—Sarah Purol
(74) Attorney, Agent, or Firm—Workman Nydegger

(57) **ABSTRACT**

Methods and apparatuses for an eyeglass case and display are provided. According to one aspect of the present invention, an eyeglass case permitting a consumer to view at least a portion of the eyeglasses is provided. In one embodiment, the eyeglass case is configured to permit a consumer to view the entire eyeglass frame. According to another embodiment, the eyeglass case provides a substantially flat surface permitting the eyeglass case to be rested on its end. According to another aspect of the present a method of and apparatus of displaying eyeglasses that includes a display member that permits a plurality of eyeglasses to be positioned one behind another such that each of the plurality of eyeglasses can be seen without needing to reposition the eyeglasses.

**11 Claims, 6 Drawing Sheets**



## US 7,188,739 B1
### Page 2

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,733,775 A | * | 3/1988 | Fireman | 206/5 |
| 4,744,461 A | * | 5/1988 | Lapham | 206/5 |
| 5,141,117 A | | 8/1992 | Olsen et al. | |
| D339,913 S | | 10/1993 | Reed | |
| 5,423,419 A | * | 6/1995 | Wentz et al. | 206/6 |
| 5,501,321 A | | 3/1996 | Liu | |
| D369,466 S | | 5/1996 | Jannard et al. | |
| 5,568,872 A | * | 10/1996 | Hinnant, Sr. | 211/85.1 |
| D400,009 S | | 10/1998 | Conway | |
| 5,899,371 A | | 5/1999 | Weliver | |
| 5,949,515 A | | 9/1999 | Hoshino | |
| D422,139 S | | 4/2000 | Meikle | |
| D425,299 S | | 5/2000 | Charbonneau | |
| 6,102,541 A | | 8/2000 | Kuo | |
| D432,784 S | | 10/2000 | Conway | |
| D432,786 S | | 10/2000 | Rogers | |
| D434,560 S | | 12/2000 | Chao | |
| D436,434 S | | 1/2001 | Conway | |
| D436,725 S | | 1/2001 | Rogers | |
| 6,170,651 B1 | | 1/2001 | Taormina | |
| D437,112 S | | 2/2001 | Toffoli | |
| 6,206,217 B1 | | 3/2001 | Chiang | |
| D439,738 S | | 4/2001 | McCormack | |
| D441,953 S | | 5/2001 | Ben Moshe | |
| D446,389 S | | 8/2001 | Zhou | |
| 6,273,246 B1 | | 8/2001 | Marciano | |
| D454,686 S | | 3/2002 | McCormack | |
| 6,382,407 B1 | | 5/2002 | Chao | |
| 6,415,915 B1 | * | 7/2002 | Grossman | 206/6 |
| D467,421 S | | 12/2002 | Chao | |
| 6,491,158 B2 | | 12/2002 | Chen | |
| 6,626,287 B1 | * | 9/2003 | Watson | 206/6 |
| D483,944 S | | 12/2003 | Conner | |
| 6,851,552 B1 | | 2/2005 | Chao | |
| 6,929,116 B2 | * | 8/2005 | Chao et al. | 206/5 |
| 2002/0157968 A1 | | 10/2002 | Chen | |
| 2003/0111361 A1 | | 6/2003 | Fischer et al. | |
| 2005/0155872 A1 | | 7/2005 | Cheng | |

* cited by examiner



Fig. 1



*Fig. 2*

U.S. Patent     Mar. 13, 2007     Sheet 3 of 6     US 7,188,739 B1



Fig. 3



Fig. 4



*Fig. 5*



Fig. 6



*Fig. 7*

US 7,188,739 B1

1

### EYEWEAR CASE AND DISPLAY METHOD

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a utility application of U.S. Provisional Patent Application Ser. No. 60/433,724 entitled "Eyewear Case and Display Methods" filed Dec. 13, 2002.

#### BACKGROUND OF THE INVENTION

1. The Field of the Invention

The present invention relates to eyeglass cases and displays. More particularly, the present invention relates to methods and apparatuses of eyeglass cases and displays.

2. The Relevant Technology

Eyeglass cases and point of sale displays have been used for many years to protect eyeglasses and to display eyeglasses to prospective buyers. The configuration of eyeglasses makes them difficult to display. Eyeglasses positioned on a flat surface can quickly become disorganized, damaged, or intertwined with frames of adjacent eyeglasses.

Eyeglass displays facilitate display of eyeglasses by presenting frames in a more organized and efficient manner. However, the configurations of typical displays have many deficiencies. The configuration of typical displays makes it difficult to remove and replace eyeglasses without dropping the eyeglasses or disturbing or damaging adjacent eyeglasses. Where the display can be rotated, eyeglasses can slip from the display and fall to the floor during movement of the display. Additionally, eyeglass displays can be expensive to manufacture and are often configured to display a limited number of eyeglasses on a large display.

Eyeglass cases are adapted to provide protection for eyeglasses. One drawback of typical eyeglass cases is that they are often opaque and prevent viewing of the frames without removing the eyeglasses from the eyeglass case. In many instances, the eyeglasses are removed from the eyeglass cases for display on point of sale displays. This increases the likelihood of damage to the eyeglass frames and lenses. Additionally, the cases are often discarded or misplaced resulting in inefficiencies due to wasted eyeglass cases, mismatched eyeglass cases and frames, or lost time spent locating the proper cases for the eyeglasses. Where an eyeglass case is used which is not matched to the eyeglasses, the chance of damaging or losing the eyeglasses increases.

Some eyeglass cases have been developed to permit a consumer to be able to see part of the eyeglasses without needing to remove the eyeglasses from the case. Such eyeglass cases allow the eyeglasses to remain positioned in the eyeglass cases during display of the eyeglasses. However, such eyeglass cases suffer from several deficiencies. Eyeglass cases that have been developed to allow a consumer to view a portion of the eyeglasses typically are difficult to open, are tailored for a particular display type, and/or do not allow a consumer to view the entire eyeglass frame. Such eyeglass cases are typically disposable in nature and are of little usefulness once the eyeglasses have been purchased.

#### BRIEF SUMMARY OF THE INVENTION

The present invention relates to methods and apparatuses of eyeglass cases and displays. An eyeglass case is provided according to one aspect of the present invention. The eyeglass case is adapted to enclose a pair of eyeglasses while permitting a consumer to view at least a portion of the

2

eyeglasses. According to one aspect of the present invention, the eyeglass case is configured to permit a consumer to view the entire eyeglass frame. In one embodiment, the eyeglass cases can be transparent, semi-transparent, or translucent to allow a consumer to view the color, style, and other aspects of the eyeglass frames. In another embodiment, the eyeglass case is reusable.

According to another aspect of the present invention, the eyeglass case provides a substantially flat surface permitting the eyeglass case to be rested on its end. By permitting the eyeglass cases to be rested on its end, the eyeglasses can be displayed in a vertical manner. This allows a large number of eyeglasses to be positioned adjacent one another in a small amount of display space. By permitting a consumer to view at least a portion of the eyeglasses, the eyeglass case allows the consumer to browse a large number of eyeglasses without having to remove the eyeglasses from the eyeglass cases. This improves the ease and efficiency of browsing eyeglasses.

The present invention also provides a display and method for displaying eyeglasses. According to one aspect of the present invention, the display includes a display member that permits a plurality of eyeglasses to be positioned one behind another such that each of the plurality of eyeglasses can be seen without needing to reposition the eyeglasses. In one embodiment, the display member includes a plurality of openings that are configured to receive an end of an eyeglass case such that each eyeglass case can be displayed in a vertical manner. In an alternative embodiment, the display member comprises a horizontally positioned shelf or tray that is configured to accommodate a plurality of vertically positioned eyeglass cases.

The combination of the display and the eyeglass case facilitates simple and efficient browsing of the eyeglasses. Additionally, the combination helps the eyeglasses stay neat and clean thus maintaining the organized and professional presentation of the eyeglasses. For example, the eyeglass cases allow a consumer to quickly identify the color, eyeglass frame style, and lens color of eyeglasses without needing to remove the eyeglasses from the eyeglass case. The configuration of the display allows a consumer to view a large number of eyeglass cases simultaneously without needing to move or reposition the eyeglass cases. Once a desired pair of eyeglasses is identified, the display permits the consumer to remove and replace the eyeglass case in which the eyeglasses are enclosed without disturbing adjacent eyeglasses. Additionally, the configuration of the display allows the consumer to return the eyeglass case to the display without affecting the organized and professional presentation of the eyeglasses. The configuration further allows a user to rotate the eyeglass display without throwing the eyeglasses to the floor.

These and other objects and features of the present invention will become more fully apparent from the following description and appended claims, or may be learned by the practice of the invention as set forth hereinafter.

#### BRIEF DESCRIPTION OF THE DRAWINGS

To further clarify the above and other advantages and features of the present invention, a more particular description of the invention will be rendered by reference to specific embodiments thereof which are illustrated in the appended drawings. It is appreciated that these drawings depict only typical embodiments of the invention and are therefore not to be considered limiting of its scope. The invention will be

US 7,188,739 B1

3

described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. 1 illustrates a perspective view of an eyeglass case according to one aspect of the present invention.

FIG. 2 shows a perspective view of an eyeglass case illustrating a mechanism for coupling the first end of the eyeglass case to the second end of the eyeglass case.

FIG. 3 shows a front view of an eyeglass case according to another aspect of the present invention.

FIG. 4 illustrates a cross-sectional view of an eyeglass case illustrating the construction of the eyeglass case according to one aspect of the present invention.

FIG. 5 illustrates a perspective view of a display for displaying eyeglasses on a shelf or table top according to one aspect of the present invention.

FIG. 6 illustrates a perspective view of a display for use on a show room floor according to one aspect of the present invention.

FIG. 7 illustrates a perspective view of a display according to one aspect of the present invention.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The present invention relates to methods and apparatuses of eyeglass cases and displays. According to one aspect of the present invention, an eyeglass case is provided which is adapted to enclose a pair of eyeglasses while permitting a consumer to view at least a portion of the eyeglasses. In one embodiment, the eyeglass case is configured to permit a consumer to view the entire eyeglass frame. According to another embodiment, the eyeglass case provides a substantially flat surface permitting the eyeglass case to be rested on its end. In this manner, the eyeglass case can be displayed in a vertical manner. This allows a consumer to view at least a portion of a large number of eyeglasses without having to remove the eyeglasses from the eyeglass case

According to another aspect of the present invention a display and method for displaying eyeglass is provided. According to one aspect of the present invention, the display includes a display member that permits a plurality of eyeglasses to be positioned one behind another such that each of the plurality of eyeglasses can be seen without needing to reposition the eyeglasses.

According to another aspect of the present invention, the combination of the display and the eyeglass case facilitates simple and efficient browsing of the eyeglasses. Additionally, the combination maintains an organized and professional presentation of the eyeglasses. For example, the configuration of the display allows a consumer to view a large number of eyeglasses simultaneously without needing to move or reposition the eyeglass cases. Once a desired pair of eyeglasses is identified, the display permits the consumer to remove and replace the eyeglass case without disturbing adjacent eyeglass cases. Additionally, the configuration of the display allows the consumer to return the eyeglass case to the display without affecting the organized and professional presentation of the eyeglasses.

With reference now to FIG. 1, there is shown an eyeglass case 1 and a pair of eyeglasses 2 positioned therein. Eyeglass case 1 provides a protective covering to eyeglasses 2 while allowing a consumer to observe part or all of the eyeglasses. In the illustrated embodiment, eyeglass case 1 comprises a body 10. Body 10 is adapted to enclose a pair of eyeglasses 2. Body 10 permits a consumer to observe at least a portion of eyeglasses 2. While eyeglass case 1 is described with

4

reference to eyeglasses 2, it will be appreciated that eyeglasses 2 are representative of a variety of types and configurations of eyewear including but not limited to reading glasses, sunglasses, and computer glasses.

In the illustrated embodiment, body 10 is substantially transparent allowing a consumer to observe the color and frame style of eyeglasses positioned in the eyeglass case 1. In alternative embodiment, the body is translucent and permits a consumer to detect the color and/or outline of the eyeglasses positioned therein. In yet another embodiment, the eyeglass case includes a first translucent or transparent portion and a second opaque portion. The transparent or translucent portion permits a consumer to observe at least a portion of the eyeglasses.

In the illustrated embodiment, body 10 includes a first side surface 12, a second side surface 14, and a third side surface 16. First and second side surfaces 12, 14 are wider than third side surface 16. The width of first and second side surfaces 12, 14 roughly corresponds with the width of the eyeglasses from the top of the lens to the tips of the temple cover when the eyeglasses are in a folded position. The width of third side surface 16 roughly corresponds with the width of the folded eyeglasses at the thickest point from the back of the temples to the front of the lenses. When eyeglass case 1 is resting on first side surface 12, the front of the eyeglass lenses are facing downwards. When eyeglass case 1 is resting on second side surface 14 the front of the eyeglass lenses are facing upwards. When eyeglass case 1 is resting on third side surface 16 the eyeglass lenses are positioned in the same manner as when worn by a consumer.

In one embodiment, the three-side configuration of body 10 provides a tailored enclosure for accommodating the folded eyeglass frames. Typically, folded eyeglasses are widest at or near the top of the eyeglasses where the temples are folded behind the lenses. The eyeglasses are narrowest at the bottom portion of the eyeglasses where the temple tips touch the frame at the bottom of the lenses. The portion of the eyeglass case corresponding with the third side surface 16 accommodates the wider top of the eyeglasses. The narrower portion of the eyeglass case opposite the third side surface 16 accommodates the narrower bottom of the eyeglasses. As will be appreciated by those skilled in the art the configuration of body 10 is not limited to the embodiment illustrated in FIGS. 1 and 2. A variety of types and configurations of body 10 can be provided. For example, in one embodiment body 10 has a two-sided configuration. In another embodiment, body has a rectangular or any shape permitting the eyeglasses to be displayed on its side. In an alternative embodiment, body 10 does not provide a tailored enclosure for the eyeglass frames.

In the illustrated embodiment, body 10 comprises a first component 20 and a second component 30. First component 20 is configured to enclose the right side of eyeglasses 2. Second component 30 is configured to enclose the left side of eyeglasses 2. To form body 10, first component 20 and second component 30 are coupled to one another. In the illustrated embodiment, the three side surface configuration of body 10 provides an orientation for correct coupling of first component 20 to second component 30.

In the illustrated embodiment, first component 20 includes an end 22 while second component 30 includes an end 32. End 22 and end 32 comprise the top and bottom surfaces of eyeglass case 1. End 22 and/or end 32 provide a substantially flat surface permitting the eyeglass case to be rested on its end and displayed in a vertical manner. By permitting eyeglasses to displayed in a vertical manner, a

US 7,188,739 B1

5

plurality of eyeglass cases can be positioned so as to allow a consumer to view the eyeglasses in an efficient and organized manner.

In the illustrated embodiment, there is also shown indicia 40 situated on end 22 of first component 20. In the illustrated embodiment, indicia 40 provides an indication of the characteristics of the eyeglasses and other information related to the eyeglasses contained therein. For example, in the illustrated embodiment indicia 40 specifies the magnification power of the eyeglass lenses. In alternative embodiments, the indicia can include, but is not limited to, eyeglass style, price, UPC code, SKU number, picture of eyeglass style, style number, and/or care information. It will be appreciated by those skilled in the art that a variety of types and configurations of eyeglass cases can be utilized without departing from the scope and spirit of the present invention. For example, in one embodiment, body 10 has a rectangular configuration with four side surfaces. In an alternative embodiment, one of the first or second ends is weighted to maintain the eyeglass case in a vertical display position.

With reference now to FIG. 2, there is shown a perspective view of eyeglass case 1 illustrating a mechanism for coupling first component 20 to second component 30. First component 20 is shown separated from second component 30. Additionally, eyeglasses 2 have been removed from eyeglass case 1. First component 20 comprises an end 22, a recess 24, and a flange 26. Second component 30 comprises an end 32, an insert 34, and a flange 36.

Recess 24 of first component 20 comprises a female element. Insert 34 of second component 30 comprises a male element. Insert 34 is adapted to be positioned in recess 24 to secure first component 20 to second component 30. Flange 26 of first component 20 abuts the end of insert 34 when insert 34 is properly positioned in recess 24. Similarly flange 36 abuts the end of first component 20 when insert 34 is properly positioned in recess 24. In this manner, a simple yet effective coupling is provided between first component 20 and second component 30.

As will be appreciated by those skilled in the art, a variety of types and configurations of coupling can be provided between first component 20 and second component 30 without departing from the scope and spirit of the present invention. For example, in one embodiment a threaded coupling is provided between first component 20 and second component 30. In an alternative embodiment, a hinged coupling is provided between first component 20 and second component 30.

With reference now to FIG. 3, there is shown an eyeglass case 50 according to an alternative embodiment of the present invention. In the illustrated embodiment, eyeglass case 50 is adapted to enclose a pair of eyeglasses while permitting a consumer to observe at least a portion of the eyeglasses. Eyeglass case 50 comprises a body 60, a first end 70, and a second end 80.

Body 60 is adapted to enclose eyeglasses 2, while permitting a consumer to observe at least a portion of the eyeglasses 2. Body 60 permits a consumer to observe at least a portion of the eyeglasses by having a transparent, semi-transparent, or translucent construction. In the illustrated embodiment body 60 has a cylindrical configuration. In an alternative embodiment, body 60 has a rectangular or triangular configuration.

First end 70 is coupled to one end of body 60. Second end 80 is coupled to the opposite end of body 60. In the illustrated embodiment, first end 70 and second end 80 comprise removable barriers maintaining the position of eyeglasses 2 in eyeglass case 50. At least one of the first and

6

second ends 70 and 80 provides a substantially flat surface permitting the eyeglass case to be rested on its end.

With reference now to FIG. 4, there is shown a cross-sectional view taken along lines 4—4 of FIG. 3 illustrating the construction of eyeglass case 50. In the illustrated embodiment, body 60 is constructed of a clear synthetic polymer. By utilizing a polymer material, body 60 provides shatterproof protection for eyeglasses that can be manufactured simply and at low cost. It will be understood by those skilled in the art that body 60 can be constructed from a variety of types and configurations of materials. For example, in one embodiment, body 60 comprises a glass tube.

First end 70 and second end 80 are inserted into the ends of body 60. First end comprises an insert 72, an end cap 74, a resilient material 76, and a contact region 78. Insert 72 is positioned internal to one end of body 60. End cap 74 is positioned external to the end of body 60. End cap 74 provides a stopping mechanism for preventing insertion of first end 70 past a given point. Resilient material 76 provides a cushion mechanism internal to first end 70. Contact region 78 permits a portion of the eyeglasses to contact resilient material 76, thus minimizing movement of eyeglasses 2 within eyeglass case 50.

Second end 80 comprises an insert 82, an end cap 84, a resilient material 86, and a contact region 88. Insert 82 is positioned internal to the other end of body 60. End cap 84 is positioned external to the end of body 60 and provides a stopping mechanism for preventing insertion of second end 80 past a given point. Resilient material 86 provides a cushion mechanism internal to second end 80. Contact region 88 permits a portion of the eyeglasses to contact resilient material 86, thus minimizing movement of eyeglasses 2 within eyeglass case 50.

In the illustrated embodiment, indicia 40 is positioned directly on eyeglasses 2. By permitting a consumer to observe at least a portion of eyeglasses 2, the configuration of body 60 allows a consumer to view indicia 40 so as to identify characteristics of the eyeglass quickly and easily. A variety of types and configurations of eyeglass cases can be utilized without departing from the scope and spirit of the present invention. For example, in the preferred embodiment the eyeglass case is reusable thus providing a mechanism for displaying the eyeglasses to a consumer and for protecting the eyeglasses on an ongoing basis subsequent to purchase of the eyeglasses. In another embodiment, the eyeglass case includes a display element that permits the eyeglass case to be hung in a vertical manner. Examples of display elements include a hook, loop, tag, adhesive tab, and the like.

With reference now to FIG. 5 there is shown a display 100 for displaying eyeglasses. Display 100 permits a plurality of eyeglasses to be positioned one behind 2 another such that a plurality of eyeglasses can be seen without needing to reposition the eyeglasses. Additionally, the configuration of display 100 permits eyeglasses to be displayed in a vertical manner, thus providing an improved and efficient browsing experience.

In the illustrated embodiment, display 100 comprises a base 110, a support structure 120, a display member 130, a front 140, and a display surface 150. Base 110 provides a mechanism for securing display 100. Base 110 allows a consumer to position display 100 on a surface such as a floor, a counter top, or shelf, thus permitting a consumer to identify and browse eyeglasses to be purchased.

Support structure 120 is coupled to base 110. Support structure 120 provides a frame for securing other components of display 100. Display member 130 is coupled to

US 7,188,739 B1

7

support structure 120 and/or base 110. Display member 130 permits a plurality of eyeglasses to be positioned in rows one behind another such that each of the plurality of eyeglasses can be seen without needing to reposition the eyeglasses. This increases the number of eyeglasses that can be displayed. Additionally, display member 130 permits the eyeglasses to be displayed in a vertical manner.

In the illustrated embodiment, display member 130 is positioned at an angle to facilitate viewing of consecutive rows of eyeglasses. In an alternative embodiment, display member 130 is positioned in a substantially horizontal manner. A variety of types and configurations of display members can be utilized without departing from the scope and spirit of the present invention. In one embodiment, display member 130 comprises a shelf on which eyeglass cases can be positioned in a vertical manner. In another embodiment, display member 130 comprises a tray adapted to allow proper positioning of the eyeglasses.

In the illustrated embodiment, display member 130 includes a plurality of openings $132a$–$n$. Openings $132a$–$n$ are configured to receive an end of eyeglasses cases $1a$–$1n$ such that the eyeglass cases are displayed in a vertical manner. Each one of openings $132a$–$n$ corresponds with a slot that accommodates the eyeglass case. The slot secures the eyeglass case such that the eyeglass case is displayed in a vertical manner. The slot is configured to conform to the shape of the eyeglass cases. In an alternative embodiment, openings $132a$–$n$ do not correspond with slots. Instead, the configuration of the openings $132a$–$n$ is sufficient to secure the eyeglass cases.

The configuration of display member 130 and openings $132a$–$n$ facilitates viewing of the eyeglasses when a purchaser is attempting to select from a variety of eyeglasses. A purchaser can quickly identify the characteristics of eyeglasses such as color, frame design, and magnification. This permits a purchaser to quickly identify desirable eyeglasses which can be inspected in greater detail.

Once a number of eyeglasses of interest have been identified, display member 130 and openings $132a$–$n$ allow a consumer to easily and efficiently remove the eyeglass cases from the display. The configuration of openings $132a$–$n$ prevents disruption of adjacent eyeglasses when removing or replacing eyeglass covers. This also permits a consumer to return the eyeglass case to its proper position in the display without difficulty and without disturbing adjacent eyeglasses, thus maintaining the organized and efficient display of eyeglasses.

In the illustrated embodiment, display 100 includes a front 140 having a plurality of indicia $142a$–$h$. Indicia $142a$–$h$ correspond with characteristics of the eyeglasses such as magnification of each row of eyeglasses. In this manner a consumer can quickly and efficiently identify rows of eyeglasses having a desired magnification. Once a given magnification is identified, the consumer can select glasses according to other characteristics, such as frame type, color, or tinting of the lenses. The configuration of eyeglass cases $1a$–$1n$ further facilitates the efficiency and ease of browsing eyeglass by permitting a consumer to view important characteristics of the eyeglasses without needing to remove the eyeglasses from the display 100.

In the illustrated embodiment, display 100 also includes display surface 150. Display surface 150 is configured to provide a mechanism for display of an emblem, logo, advertisement, or informational materials to a consumer. As will be appreciated by those skilled in the art, the configu-

8

ration and placement of the display surface can be varied without departing from the scope and spirit of the present invention.

With reference now to FIG. 6 there is shown an alternative embodiment of display 100. In the illustrated embodiment display 100 comprises a base 110, a support structure 120, display members $130a$–$h$, and a display surface 150. Base 110 secures the display while providing aesthetic and functional design features to the display. The height of base 110 facilitates display of eyeglasses by positioning the lowest display members within a consumer's reach.

Support structure 120 is coupled to base 110. Support structure 120 provides a central frame mechanism to which display members $130a$–$h$ are coupled. Display members $130a$–$d$ are positioned on one side of support structure 120. Display members $130e$–$h$ are positioned on the opposite side of support structure 120. By providing a plurality of display members, a variety of types and configurations of eyeglasses can be provided. For example, a wide range of lens powers and different colors and intensities of lens shading of can be provided. Additionally, frames having different styles, colors, and construction can be displayed.

With reference now to FIG. 7, there is shown yet another embodiment of display 100 according to one aspect of the present invention. In the illustrated embodiment display 100 has a rectangular configuration. Base 110 comprises a wide and solid foundation for display 100. Support structure 120 has a skeleton frame configuration to provide support to five display members on each of four sides of the display. Additionally, reflective surfaces $160a$–$e$ are provided. Reflective surfaces $160a$–$e$ provide a mechanism for allowing consumers to observe their visage while wearing the selected eyeglasses.

As will be appreciated by those skilled in the art, a variety of types and configurations of displays can be utilized without departing from the scope or spirit of the present invention. For example, in one embodiment the display has three sides instead of four sides as shown in FIG. 7. In another embodiment, the support structure is integrally coupled to the display member. In yet another embodiment, the display is rotatable about a central axis. In an alternative embodiment the display is disposable. In yet another embodiment, the display is configured to permit a plurality of substantially clear eyeglass cases to be hung such that the eyeglasses are displayed vertically.

One presently preferred method of displaying eyeglasses enclosed in eyeglass cases will now be described in relation to FIGS. 1–7. A display 100 having one or more display members 130 for containing glasses is provided. Next, a first eyeglass case containing a pair of eyeglasses is positioned on display member 130. Next, at least a second eyeglass case containing a pair of eyeglasses is positioned on the display member 130 behind the first eyeglass case such that a consumer can view the eyeglasses in the first and second eyeglass case simultaneously.

Another presently preferred method of displaying the eyeglasses will now be described. In the embodiment, a display having at least a first display member is provided. Next, a first eyeglass case permitting a user to view an entire frame of eyeglasses and containing a pair of eyeglasses is hung on the display member such that the eyeglasses are positioned vertically. Next, a second eyeglass case permitting a user to view an entire frame of eyeglasses and containing a pair of eyeglasses is hung on the display member behind the first eyeglass case such that the eyeglasses are positioned vertically.

US 7,188,739 B1

9

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed is:

1. An eyeglass display comprising:
a support member;
one or more display members having a plurality of openings, wherein each of said plurality of openings is adapted to receive an eyeglass case and is configured to permit a consumer to view at least a portion of the eyeglasses enclosed therein, wherein at least one eyeglass case is received by one of said plurality of openings and is displayed in a substantially vertical manner, said eyeglass case comprising,
a body adapted to enclose a pair of eyeglasses, said body have a first component and a second component, said second component having a substantially flat surface at one end thereof, said body configured to permit a consumer to observe at least a portion of the pair of eyeglasses enclosed within said body, wherein said substantially flat surface at said one end of said second component permitting said eyeglass case to be positioned on said substantially flat surface at said one end of said second component in a substantially vertical manner.

2. The eyeglass case of claim 1, wherein each of said plurality of openings corresponds with a slot configured to secure said eyeglass case in a substantially vertical manner.

3. The eyeglass case of claim 1, wherein each slot is configured to conform to the shape of said eyeglass case.

4. The eyeglass case of claim 1, wherein said display member is positioned at an angle to facilitate viewing of consecutive rows of eyeglasses.

5. The eyeglass case of claim 1, wherein said display further comprises at least a second display member.

10

6. An eyeglass display comprising:
a base;
a support structure coupled to said base; and
one or more display members having a plurality of eyeglass cases positioned in a substantially vertical manner one behind another, wherein at least one of said plurality of eyeglass cases comprises,
a body adapted to enclose a pair of eyeglasses, wherein said body is configured to permit a consumer to view the eyeglasses contained therein, said body comprising a first component and a second component coupled to said first component, wherein at least one of said first and second components is configured to permit said body to stand in a substantially vertical manner,
wherein said plurality of eyeglass cases are positioned to allow each of the plurality of eyeglasses to be seen without requiring removal of at least one of said plurality of eyeglass cases from the display.

7. The eyeglass case recited in claim 6, wherein the first component and second component are removably coupled.

8. The eyeglass case recited in claim 6, wherein both of said first component and said second component have a substantially flat surface at the end thereof.

9. The eyeglass case recited in claim 6, wherein one of said first component and said second component have a substantially flat surface at the end thereof.

10. The eyeglass display recited in claim 6, wherein the display is configured for hanging.

11. The eyeglass display recited in claim 6, wherein said substantially vertical manner of displaying said eyeglass case comprises said eyeglass case being placed in a position equal to or greater than a forty-five degree angle and equal to or less than a ninety degree angle relative to the base of the display.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.        : 7,188,739 B1                              Page 1 of 2
APPLICATION NO. : 10/360264
DATED             : March 13, 2007
INVENTOR(S)       : Raile

    It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Drawings
Sheet 4, replace Figure 5 with the figure depicted herein below, in which the "support structure" has been labeled with --120--



Column 1
Line 46, after "losing" remove ","

Column 6
Line 52, remove "2"

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,188,739 B1                                          Page 2 of 2
APPLICATION NO. : 10/360264
DATED              : March 13, 2007
INVENTOR(S)      : Raile

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 9
Line 19, after "comprising" change "," to --:--
Line 21, change "have" to --having--
Line 24, change "least-a" to --least a--
Line 31, change "case" to --display--
Line 34, change "case" to --display--
Line 36, change "case" to --display--
Line 39, change "case" to --display--

Column 10
Line 8, after "comprising" change "," to --:--

Signed and Sealed this

Thirty-first Day of July, 2007



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# EXHIBIT B

# EXHIBIT C







